Hunt & Macaulay vs. Mississippi Central Railroad Company.

No. 5355.

HUNT & MACAULAY VS. MISSISSIPPI CENTRAL RAILROAD COMPANY.

A railroad corporation will not be held liable for the value of property erroneously receipted for by one of its station agents, and which was never received by the road, when the party claiming the value of the property, who is the factor and agent of the alleged consignor, fails to show that he has made any specific loan on said property, on the faith of the agent's erroneous receipt.

The case would not be different, even if the plaintiff were a stranger, who had advanced money purely on the faith of the receipt.

The clause in a bill of lading, which acknowledges the receipt of property, or declares as to its condition, may be disproved by parol proof.

The holder of a bill of lading can acquire no greater rights under it than were possessed by the original consignee.

A common carrier is no more bound by a bill of lading given by his agent, for goods not received by him, than by a bill of exchange signed with his name by one not authorized to sign it.

APPEAL from the Fourth District Court, parish of Orleans. *Lynch, J.*

*Thomas Hunton,* for plaintiff and appellee.

*L. E. Simonds,* for defendants.

The opinion of the court was delivered by

MARR, J. Plaintiffs seek to recover of defendant the value of fourteen bales of cotton, alleged to have been shipped by J. W. Mitchell & Co., at Goodman, Mississippi, consigned to plaintiffs, and not delivered.

The defendant answers that four of the bales have been delivered or accounted for; and as to the remaining ten bales that there were two receipts or railroad bills of lading given by the station agent at Goodman, one dated the eighteenth of December, 1869, for ten bales, the other dated the first of January, 1870, for thirty-three bales; that by mistake of the agent the ten bales for which the receipt of the eighteenth of December was given were included in the receipt of the first of January; that thirty-three bales only were delivered; and that defendant is not liable for the cotton which was not delivered to the agent.

There was judgment in favor of plaintiff for the value of twelve bales, and defendant has taken this appeal.

We think that the proof accounts satisfactorily for four of the bales, and we understand from the brief of counsel for plaintiffs that the controversy is limited to ten bales.

A comparison of the two receipts shows the identity of the marks and numbers of the ten bales for which the receipt of the eighteenth of December was given and ten of the thirty-three bales included in the receipt of the first of January; and the testimony of Kendel, the station agent at Goodman, explains this fully, and shows how the mistake occurred.

About the eighteenth of December the road was blocked with cotton

and Kendel ceased to give receipts until about the first of January. On that day the shipping clerk of J. W. Mitchell & Co. went with his check-book to the station-agent to get a receipt, and the whole number of bales which had been delivered by Mitchell & Co. was found to be thirty-three. The receipt of eighteenth of December was given by Kennedy, the assistant of Kendel, and Kendel, not knowing that it had been given, gave the receipt of the first of January for the whole number, thirty-three, including the ten bales for which the receipt of the eighteenth of December had already been given.

Afterward, the agent, having discovered the mistake, went to Mitchell & Co., and they stated to him that they had but one lot of the same marks; that is was probable duplicate receipts had been given; but that they claimed only what their book showed.

One of the plaintiffs, interrogated on facts and articles, stated that Mitchell & Co., after this suit was brought, asked plaintiffs " to stop the proceedings for fear of duplicate receipts." Before that they had told plaintiffs that all the cotton claimed had been put on the platform at the railroad depot, and that the railroad owed for it.

We have no doubt that the ten bales mentioned and described in the receipt of the eighteenth of December were identical with ten of the bales included in the receipt of the first of January; that this mistake occurred just as stated by Kendel; and that he neither perpetrated nor intended any fraud.

The two receipts differ only in date, number of bales, etc., and, omit-ting these particulars, they read as follows:

"Received of J. W. Mitchell & Co., — bales, etc., to be transported from Goodman, on the Mississippi Central Railroad, to New Orleans, and consigned to Hunt & Macaulay. But this company receives said cotton for transportation conditioned that it shall be liable only for loss resulting from negligence."

It will be seen that this instrument differs from the more formal bill of lading in general use in transportation by water. It contains no words of negotiability; it makes no stipulation for the payment of freight, and it does not bind the carrier in express terms to deliver to the consignee.

Plaintiffs base their right to recover on the ground that they made advances to Mitchell & Co. on the faith of these receipts which they would not otherwise have made. The defense is that the corporation is not bound by the receipt or bill of lading given by the station-agent in error, and that it is not liable for the cotton not actually delivered to the agent for transportation.

The answer of plaintiffs to the second interrogatory propounded to them explains the relations between them and Mitchell & Co. in few words:

"J. W. Mitchell & Co. owed plaintiffs a large balance in the fall of 1869. We made an arrangement with them by which they were to continue their shipments to us and we were to advance a portion of this value, the object being to give them an opportunity to pay off their debts."

On the seventeenth of December, 1869, Mitchell & Co. owed plaintiffs a balance of $12,912 15, against which plaintiffs held, for sale at that date, fourteen bales of cotton. From the seventeenth of December to the fifteenth of March inclusive plaintiffs made other advances amounting to $13,013. The total credits during that period aggregated $18,-163 94, which extinguished the debt subsequent to the seventeenth of December and left $6150 94 to be applied to the $12,912 15, balance due on the seventeenth of December, thus reducing that balance and the entire indebtedness of Mitchell & Co. to $6761 21, which was closed on the first of April, 1870, by the notes of Mitchell & Co.

An inspection of the account rendered by plaintiffs will show that the advances were not made specifically, but were carried into general account, just as were the proceeds of sales. For example: the account beginning the seventeenth of December was increased up to the first of January to $17,035 03; reduced by sales credited the twenty-second and thirtieth of December to $14,763 66, and this was at the time the road was blocked with cotton, and shipments from Goodman must have been very uncertain. And again, from the nineteenth of January to the fifteenth of March inclusive, when there was no longer reason to expect the delivery of the ten bales short on the receipts of the eighteenth of December and the first of January, plaintiffs made advances to Mitchell & Co. aggregating something over five thousand dollars. It is not probable that a business of so much interest and importance to the plaintiffs would have been seriously affected or the amount of advances to Mitchell & Co. materially increased or diminished by the shipment of ten bales more or ten bales less at so early a period in the shipping season, when plaintiffs were just beginning to realize the benefits which they hoped for from the advances to Mitchell & Co.

In the usual course of business, after the carrier has received the goods, he gives a bill of lading to the shipper, and the shipper transmits it with a letter of advice to the consignee. The consignee can not, ordinarily, in the very nature of things, verify the signature of the shipmaster, or clerk of a boat, or raiload station-agent, by whom, at some remote place, it may be in a foreign land, the bill of lading purports to have been signed. But he is legally bound to know the signature of his regular correspondents, and when he receives the bill of lading he honors the bill of exchange drawn against the shipment or makes the required advance, not upon any proof which the bill of lading affords him of its

genuineness or of the authority of the person by whom it purports to have been signed, of which in most cases he must be ignorant, but upon the confidence which he reposes in the good faith of his correspondent, the shipper, who forwards to him the bill of lading and letter of advice and who must have perfect information as to its genuineness and the authority of the person by whom it is signed.

The contracts of affreightment of which the two receipts in question are the evidence were made with Mitchell & Co. at the locality at which the shipments were made. These receipts were transmitted by Mitchell & Co. to the plaintiffs. Plaintiffs did not rely on the railroad-agent; they relied on their regular correspondents, Mitchell & Co., who, by the mere fact of transmitting the receipts to plaintiffs, warranted them to be genuine and correct in every particular.

Plaintiffs were the factors, the agents of Mitchell & Co., and this relation between them was not a new one. The cotton belonged to Mitchell & Co., and when it went into the hands of plaintiffs they were entitled to retain the proceeds on account of their advances. If the cotton had been damaged or lost *in transitu* or at any time before the sale and delivery by the plaintiffs, the loss would have fallen on Mitchell & Co., and not on the plaintiffs. The case, therefore, with which we are dealing is not that of a stranger making a shipment and obtaining advances or selling the goods to arrive on the mere showing of the bill of lading. It is the case of a principal who, for two seasons at least, has been shipping his property for sale for his account to his regular consignee and agent, in the course of a regular and continuous business, and who, in the course of that business, sends the evidence of a single shipment larger than that actually made at that time, and who, it may be, obtains a larger advance thereby than would otherwise have been made at that time. This consignee, holding the bill of lading, might indeed sue the carrier, in his own name, for short delivery, but the suit would be in reality for the benefit of the shipper, the owner, and the consignee could only exercise, as agent, the rights of his principal, and recover upon the contract to the same extent as the principal might have done in a suit in his own name.

So far as this branch of the case is concerned the question is, not whether a stranger, the innocent holder for value of a bill of lading, may recover of the carrier for short delivery, but whether the owners of the property, the shippers, Mitchell & Co., who had full knowledge of the mistake in the bill of lading, who could not have been ignorant of the quantity or of the marks of their own cotton, are to be allowed to take advantage of this mistake on the part of the station-agent, by which they were not deceived, and which occasioned to them no loss or diminution of property. Can the carrier be compelled to pay so much

29

of the debt of Mitchell & Co. to the plaintiffs as would have been paid if Mitchell & Co. had actually shipped the ten bales of cotton, which they did not ship and which they did not have to ship?

It must not be forgotten that Mitchell & Co. began the business of 1869–70 with a large balance against them; that that balance was nearly doubled by subsequent advances; that the proceeds of the shipments made by them during that season exceeded by $6150 94 the advances made that season and reduced by that amount the balance against them with which that season's business commenced; that by subsequent settlements their indebtedness to plaintiffs had been reduced to about two thousand dollars; and, if plaintiffs succeed in the present suit, Mitchell & Co. will have the benefit of the amount recovered by the reduction, *pro tanto*, of their debt to the plaintiffs.

The carrier took care to limit his liability to loss resulting from negligence. It is evident that this negligence must be predicated of some act or omission subsequent to the delivery of the goods to the carrier, and the contract can not be made to relate back to any period anterior to this delivery. It is not pretended that there was any act or omission constituting negligence subsequent to the delivery of the cotton to the carrier. He simply did not transport and deliver to the consignee that which had not been delivered to him for that purpose, and no law makes him liable for such failure.

It is elementary in the law of carriers that the goods to be transported must be received by the carrier before his liability commences. This is expressed in the Roman law, Dig. Lib. iv., tit. 9, thus: "IT PRÆTOR: *Nautæ*, etc., *quod cujusque salvum fore* RECEPERINT, *nisi restituant in eos judicium dabo*." It is evident from the terms of our Code, articles 2751 (2722) *et seq.*, that delivery to the carrier is a prerequisite to liability; and this is forcibly and neatly expressed in the maxim: "*La marchandise est obligée au botel, et le botel est obligé à la marchandise.*"

It is unquestionably true, as a general proposition, that the master or clerk of a vessel can not bind the owner by a bill of lading for goods which have not been delivered for transportation, and no greater power or authority in this respect can be claimed for a railroad station-agent.

The receipt in this case is for thirty-three bales of cotton; the proof is conclusive that there were but twenty-three bales. Can the consignee, the agent of the owners, the shippers, hold the carrier for the ten bales?

It is well settled that so much of a bill of lading as is a receipt may be explained, while that part of it which is a contract can not be explained by parol testimony. That part of the instrument which acknowledges the receipt of the goods may be explained, and it may be shown that the goods, in fact, were not delivered to the carrier; but, if the goods have been actually received, the contract to transport them to

the place of destination and there to deliver them in the like order in which they were received to the consignee, or to his assigns, or to order, according to the terms, can not be modified or explained by parol.

Bills of lading have been for a long time considered as negotiable instruments, and they are in very general use as the means of obtaining advances on goods on shipboard to arrive. These bills of lading contain words of negotiability, obligating the carrier to deliver to the consignee, or to his assigns, or to the order of the shipper, and the opinion has prevailed to a considerable extent that the person who advances his money on the faith of a bill of lading in which he is named as consignee or which comes to him by regular transfer from the consignee or the shipper to his own order is to be protected in the same manner as the innocent holder for value, before maturity, of a bill of exchange.

There was always this difficulty inherent in the bill of lading, where there was no question as to the authority of the person by whom it was signed. The bill of lading is in part a receipt and in part a contract, and, while it might not be admissible to explain or vary a contract in writing by parol testimony, it is elementary that a receipt is always open to explanation.

The true principle would seem to be that the bill of lading is negotiable in this restricted sense, that it is transferable by assignment or indorsement, and that the transferee takes it with all the rights against the carrier that it conferred upon the original consignee, or the person to whose assigns or to whose order the goods are to be delivered, while the innocent indorsee for value, before maturity, of a bill of exchange has nothing to do with the rights of the original parties as between themselves.

The failure to observe this plain and obvious distinction has caused the elementary principle, that a receipt may always be explained, to be lost sight of, and cases are to be found in which it was decided that, as against the innocent holder for value of a bill of lading, the carrier could not show that the quantity of goods acknowledged by the bill of lading to have been received was not actually delivered to him, nor that the real condition, though not indicated by any external manifestation, was different from the apparent good order recited in the bill of lading.

To this class of cases may be referred Bradstreet vs. Herne, Abbott's Admiralty Reports, 209, decided in 1848, and Dickerson vs. Seelye, 12 Barbour, 99, decided in 1851. The case of the Mary Ann Guest, Olcott, 500, simply decides that the carrier can not exonerate himself from liability to the holder of the bill of lading on the ground that after arriving at the port of destination, the goods were taken out of his possession by the sheriff at the suit of the vendor claiming the right of stoppage *in transitu.*

In Wolter vs. Brewer, 11 Mass., 100, decided in 1814, the master of the ship had signed, at Montevideo, a bill of lading for ten packages of skins, and the bill of lading was properly indorsed to an innocent third person for value. On the arrival of the vessel at Boston the master delivered five of the ten packages, and the suit was against the owner of the ship for the five packages not delivered. The fraud of the master in signing the bill of lading was manifest, and the court held that he had no power to bind the owner by signing bills of lading for goods not actually shipped.

There seems to have been some doubt about the law on this subject in England before the case of Grant vs. Norway, decided in 1851. The case was this: A ship was lying in the Hoogly, bound for London, and the master signed a bill of lading for twelve cases of silks, consigned to order. A bill of exchange on London was drawn against this shipment, and the bill of lading was indorsed to and deposited as security with the innocent indorsee of the bill of exchange, who gave value for it. The silks were not delivered to the master, and the ship sailed without them. Acceptance of the bill of exchange was refused by the drawee, and the innocent holder brought suit against the owners of the ship to recover the amount advanced by him on the faith of the bill of lading. The owners raised the direct question as to the authority of the master to bind them by a bill of lading for goods not delivered to him. The verdict of the jury was special, finding the facts substantially as stated, and the law point was reserved for argument. A stronger case in favor of the holder of the bill of lading could not well be imagined. The discussion was most elaborate, and the court fully appreciated the importance of the issues involved. The Chief Justice delivering the opinion of the court in favor of the defendants, puts the question thus: " Whether the master of a ship signing a bill of lading for goods which have never been shipped is to be considered as the agent of the owner in that behalf, so as to make the latter responsible ?"

After stating the great authority necessarily vested in the master of a ship, extending even to the signing of a bill of sale, in case of disaster, the court said:

" So, with regard to goods put on board, he may sign a bill of lading and acknowledge the nature and quality and condition of the goods.

" The very nature of the bill of lading shows that it ought not to be signed until the goods are on board, for it begins by describing them as *shipped.* Buller, J., in Lickbourn vs. Mason, 2 T. R. 75, said: ' A bill of lading is an acknowledgment by the captain of having received the goods on board his ship; therefore, it would be a fraud in the captain to sign such a bill of lading if he had not received the goods on board, and the consignee would be entitled to his action against the captain for his fraud.'

"It is not contended that the captain had any real authority to sign the bills of lading unless the goods had been shipped. Nor can we discover any ground on which a party taking a bill of lading by indorsement would be justified in assuming that he had authority to sign such bills, whether the goods were on board or not.

"If, then, from the usage of trade and the general practice of shipmasters, it is generally known that the master has no such authority from his position as master, the case may be considered as if the party taking the bill of lading had notice of an express limitation of the authority, and in that case, undoubtedly he could not claim to bind the owner by a bill of lading signed when the goods therein mentioned were never shipped.

"So, here, the general usage gives notice to all people that the authority of the captain to give bills of lading is limited to such goods as have been put on board, and a party taking a bill of lading, either originally or by indorsement, for goods which have never been put on board, is bound to show some particular authority given to the master to sign it." 2 Eng. S. and E. 337; 70 Eng. C. L. 665.

This decision settled the law in England, and it has been adhered to uniformly since. See Hubberty vs. Ward, 18 Eng. S. and E. 551; Coleman vs. Riches, 29 Eng. S. and E. 323; Jesse vs. Bath, the Law Reports, vol. 2, p. 267.

The same doctrine was asserted and maintained by the Supreme Court of the United States at the December term, 1855, in the schooner Freeman vs. Buckingham, 18 Howard.

Hickox owned the schooner. He sold her to John Holmes for forty-five hundred dollars, payable in installments, from June, 1851, to December, 1853. One of the installments had become due and was paid, Hickox obligating himself to make title when the price was paid.

John Holmes permitted his son, Sylvanus Holmes, to take charge of and employ the schooner as he chose, and Sylvanus put the captain and crew on board. He induced the captain to sign bills of lading for a quantity of flour consigned to libelants, which were intended to be and were used to obtain advances on the pretended shipment.

On the faith of these bills of lading the consignees, who lived at the city of New York, advanced a large sum to Sylvanus Holmes, who lived at Cleveland, Ohio. Thirteen hundred and sixty barrels of the flour mentioned in the bills of lading were not delivered, and were never shipped. The consignees proceeded against the schooner in admiralty, and Hickox intervened to claim and protect his property.

In the course of an able and elaborate opinion, the court said:

"A willful fraud, committed by the master on an innocent third person, by signing false bills of lading, would not be within his agency. If the

signer of the bill of lading was not the master of the vessel, no one would suppose the vessel bound, and the reason is, because the bill is signed by one not in privity with the owner.    But the same reason applies to a signature made by a master out of the course of his employment.    The taker assumes the risk not only of the genuineness of the signature and of the fact that the signer was master of the vessel, but also of the apparent authority of the master to issue the bill of lading.    But the master of a vessel has no more an apparent, unlimited authority to sign bills of lading than he has to sign bills of sale of the ship.    He has an apparent authority, if the ship be a general one, to sign bills of lading for cargo actually shipped, and he has also authority to sign a bill of sale of the ship, when, in case of disaster, his power of sale arises.    But the authority, in each case, arises out of and depends upon a particular state of facts, and it is incumbent upon those who are about to change their condition, upon the faith of his authority, to ascertain the existence of all the facts upon which his authority depends."    P. 191.

In Fearn vs. Richardson, 12 An., decided in 1857, and Fellowes vs. Steamboat Powell, 16 An., decided in 1861, the Supreme Court of Louisiana held that the master can not bind the owner by signing bills of lading unless the goods are actually delivered or put on board.

In the Lady Franklin, 8 Wallace, decided at the December term, 1869, the consignees were the owners of the goods.    The intention was to ship them by the Lady Franklin, and the bill of lading was signed for that vessel without any fraudulent intent.    Before the Lady Franklin arrived, by some mistake, the goods went on board another vessel of the same line which foundered on the voyage with the goods on board.    The consignees libeled the Lady Franklin for non-delivery.    The court said:

" The attempt made in the prosecution of this libel to charge this vessel for the non-delivery of a cargo which she never received, and, therefore, could not deliver, because of a false bill of lading, can not be successful, and we are somewhat surprised that the point is pressed here.

" In so far as a bill of lading is a contract, it can not be explained by parol, but if a contract, it is also a receipt, and in that regard it may be explained, especially where it is used as the foundation of a suit between the original parties, the shippers of the merchandise and the owner of the vessel.

"The principle is elementary, and it needs the citation of no authority to sustain it.

" The case of the schooner Freeman vs. Buckingham is decisive of this case.    It is true, the bill of lading there was obtained fraudulently, while here *it was given by mistake*, but the principle is the same."    P. 329.

The three cases last cited, unlike all the others, were not complicated with any question as to the right of an innocent third party advancing

money on the faith of the bills of lading.    The case of the Lover, how-
ever, decided in the Circuit Court of the United States, at New York,
1870, reported in 7 Blatchford, is like the Massachusetts and English
cases, and the case of the schooner Freeman vs. Buckingham, in that re-
spect..

Green owned the schooner Lover, lying at Baltimore.  He sold the ves-
sel to Gilley, who paid part of the price and agreed to pay the balance
within five days after his arrival at New York.  The master, who had
been employed by Green, remained in command.  Gilley took possession
and put a cargo of lumber on board.  Meeting Green on the street, he
requested him to send the captain to the broker's office to sign the bills
of lading.  The master went to the broker's office, and, having no knowl-
edge of the quantity of lumber on board, signed the bills of lading as
requested by Gilley.  Gilley took the bills of lading to New York and ob-
tained large advances from the consignees.  When the schooner arrived
at New York it was found that she had not more than half the lumber
on board called for by the bills of lading.  The consignees proceeded
against the schooner in admiralty, and Green intervened, claiming to be
the owner, and that the schooner was not bound.

The court, citing Grant vs. Norway, Hubberty vs. Ward, Coleman vs.
Riches, and the schooner Freeman vs. Buckingham, held that the mas-
ter had no power to charge the owner or the vessel by signing bills of
lading for cargo not on board.

In Nelson vs. Woodruff, 1 Black, S. C. U. S., a quantity of lard was
shipped at New Orleans, consigned to Woodruff & Co. at New York.
The bill of lading acknowledged the receipt of the lard in good order
and condition.  On the faith of the bill of lading the consignees made
large advances on the shipment.  It was found, on the arrival of the
vessel, that there had been an extraordinary loss on the voyage, some
sixty thousand pounds of the lard.  The consignees refused to pay the
freight and primage; and the carrier sued them.  The consignees set up
the short delivery, and claimed six thousand dollars in damages.

The court held, notwithstanding the clean bill of lading, and the large
advances made by the consignees on the faith of it, that the carrier might
prove that the loss resulted from inherent defects in the lard; that the ac-
knowledgment of the receipt in good order and condition relates to the ex-
ternal appearance of the package, not to the actual internal condition, which
could be ascertained by inspection alone, and that it does not conclude
the carrier as to the actual condition, different from the apparent condi-
tion.  The carrier is bound *prima facie* by the acknowledgment as to quan-
tity and condition, and the burden is on him to show a less quantity, or a
different condition.  The court attached no importance to the fact that
the consignees had made large advances on the faith of the bill of lad-

ing, and the carrier recovered his freight and primage. See, also, Abbe vs. Colon, 51 N. Y. 410.

Sears vs. Wingate, decided by the Supreme Court of Massachusetts in 1861, 3 Allen, 103, is also a very instructive case. Wingate, living at Boston, bought of Sturtevant, at Philadelphia, a cargo of coal, to be paid for on the receipt of the bill of lading. The master of the schooner, who was one of the owners, signed a bill of lading for 403 tons, and Wingate settled for that quantity of coal on receipt of the bill of lading, ten days before the arrival of the schooner at Boston. On weighing the coal at Boston it was found to be short about twelve tons. The owners of the schooner sued Wingate for freight on the quantity delivered, and he claimed a set-off for short delivery.

The court, reviewing the leading cases, laid down the following propositions, and maintained them on principle and authority:

First—" The receipt in the bill of lading is open to explanation between the master and the shipper of the goods.

Second—" The master is estopped, as against the consignee, who is not a party to the contract, and as against an assignee of the bill of lading, when either has taken it for a valuable consideration upon the faith of the acknowledgments which it contains, to deny the truth of the statements to which he has given credit by his signature, so far as those statements relate to matters which are or ought to be within his knowledge.

Third—" When the master is acting within the limits of his authority, the owners are estopped in like manner with him, *but it is not within the general scope of the master's authority to sign bills of lading for any goods not actually received on board.*"

There remained to be dealt with the important fact that the master, who signed the bill of lading, was one of the owners, one of the plaintiffs in the action. The court said:

" If the receipt in this bill of lading is to be considered a statement erroneously but not fraudulently made, respecting the quantity of goods really received, and not intended to include others not received, it would be open to the master as well as the owners to explain the error, because the master has no opportunity to ascertain the exact weight, and could not be supposed to intend to warrant it. Shepherd vs. Naylor, 5 Gay, 592. But if it were regarded as a receipting for property not on board, then the bill of lading would not be conclusive against the owners, and would be against the master."

The court proceeds to say that, under the circumstances, it would not be equitable to allow the claim of the defendant as against the plaintiffs, all the owners, on account of a fraud or misrepresentation of one of them, for which the others are not responsible. "There is no evidence to

show what the contract between the owners was, or that the master had any authority to bind them, except that which resulted from his employment in that capacity."

There was, accordingly, judgment in favor of the plaintiffs for the freight.

The doctrine thus settled by the authoritative decisions which we have .cited seems to be equally well settled in Louisiana by positive law.

By act of 1868, No. 150, section five, all carriers, and their agents, are forbidden to sign or give any bill of lading unless the merchandise or property "shall have been actually shipped and put on board, and shall be at the time actually on board, or delivered to be carried or conveyed as expressed in said bill of lading."

Section seven makes the violation of any of the provisions of this act "a criminal offense," punishable by fine not exceeding five thousand dollars, or imprisonment in the penitentiary for a term not exceeding five years, or both. Moreover, the person offending is liable to the party aggrieved for all damages, immediate or consequential, which he may have sustained by reason of such violation, whether the person offending shall have been convicted of fraud or not.

Section nine makes bills of lading "negotiable by indorsement in blank or by special indorsement, in the same manner and to the same extent as bills of exchange and promissory notes are."

" Whatever is done in violation of prohibitory law is void, although the nullity be not formally directed." C. C., art. 12.

This statute of 1868 not only prohibits the signing of a bill of lading for property not delivered for transportation, but makes it a crime, punishable with extraordinary severity, and subjects the offender to all the pecuniary damage which may be occasioned by his crime. It would be a waste of words to do more than assert that no one is bound by an act so highly criminal but the offender himself; and when section nine makes bills of lading negotiable, in the same manner and to the same extent as bills of exchange and promissory notes are, it means genuine bills of lading. It was no more the intention nor within the power of the Legislature to bind the carrier by a false bill of lading, or one signed for him by a person not authorized, than to make one liable as a party to a promissory note or a bill of exchange signed in his name by a person not authorized to bind him as the maker, or drawer, or acceptor, or indorser of a bill of exchange or promissory note.

The bill of lading is negotiable, that is, by indorsement the transferee acquires all the rights which the instrument creates against the carrier, just as the indorsement of a bill of exchange or promissory note vests in the transferee all the rights which the instrument creates against the prior parties.

The bill of lading in this case was signed in the State of Mississippi, and the cotton was to be delivered at the city of New Orleans. We are not troubled with any question of the conflict of laws; because we are not advised that the law of Mississippi differs from our own, and the legal presumption is, and we must act upon it, that the law of that State is like our own in any given case where the contrary is not shown.

The apparent hardships to the consignee, or the innocent holder of the bill of lading, must be eliminated, and it can not be regarded as a factor in the solution when we remember that in all such cases the question is purely one of agency. He who advances money on the faith of a bill of lading, or who looks to a, bill of lading as security, encounters the risks to which every other person is subject who deals on the faith of one professing to be agent for another. He is bound to know the extent of the agent's authority. If the agent exceeds his authority, if power has not been delegated to him to do the thing which he does, no matter how large may be the authority vested in him, the principal is not bound. The master of a ship, the agent of the carrier, to whom authority is delegated to sign bills of lading has no such power unless the goods have actually been received for transportation; and when he signs a bill of lading for goods not received, whether fraudulently or by mistake, he subjects himself personally to all the legal consequences of the act, but he is no more the agent of the carrier, in that behalf, than any stranger would be; and the carrier is not bound, because the person professing to be his agent was not his agent for that purpose.

These propositions are clearly laid down in or are plainly and logically deducible from the English and American cases cited; and the statute of Louisiana, and they are in perfect accord with well-established elementary principles in the law of agency and the law of carriers.

It follows that the station-agent did not bind the corporation, the railroad company, by signing a bill of lading for cotton which was not delivered to him for transportation, because he was not the agent of the company in that behalf.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be avoided and reversed, and that there be judgment in favor of defendant, appellant, against the plaintiffs, appellees, rejecting the demand of plaintiffs, with costs in both courts.

MANNING, C. J. I concur in the opinion of Mr. Justice Marr.

---

### CONCURRING OPINION.

EGAN, J. The account of plaintiffs with Mitchell & Co., and other evidence in the record, justify the conclusion that the credit of the

latter firm with plaintiffs would not at the time have been materially affected by the reception or non-reception of ten bales of cotton more or less. The error which led to duplicate receipts or bills of lading was as much attributable to Mitchell & Co. as to the agent of defendants. The cotton was consigned to plaintiffs as commission merchants of Mitchell & Co., and for account of Mitchell & Co., whose credit with plaintiffs resulted not from this single transaction, but was established long before and continued long after. Mitchell & Co. are to be the real beneficiaries by this action. Its fruits, if any, would go to their credit, which I do not think either equitable or legal under the facts of this case. We can not consider plaintiffs as third parties in this matter. Were they so, however, and whatever the scope and effect of the statute of 1868 declaring bills of lading negotiable, the reception of two bills in so short a time, both containing cotton not only of the same marks but of the same numbers, was certainly enough to put plaintiffs upon inquiry. This is more apparent from the evidence of Hunt, himself, who says : " After the railroad failed to deliver fourteen bales, I had a suspicion that some of the bales had been receipted for twice." He also says: "*Receipts were put on file when received, and the cotton entered when received,*" thus showing double examination of the bills and the caution of a good business house in not dealing with cotton as received till arrival, notwithstanding the bills of lading were in hand. I concur in the decree rejecting plaintiffs' demand and in favor of the defendants.

## DISSENTING OPINIONS.

SPENCER, J. I can not concur with the majority of the court in this case. The plaintiffs, merchants of New Orleans, bring this suit by attachment against the defendant, and garnishee certain funds in the hands of the New Orleans and Jackson Railroad Company.

They allege that the firm of J. W. Mitchell & Co., of Goodman, Miss., consigned to them, and that the defendant receipted for, ten bales of cotton on the eighteenth of December, 1869, thirty-three bales on the first of January, 1870, six bales on the fifteenth of January, 1870, and eight bales on the twenty-fourth of January, 1870 ; that the receipts or bills of lading of said railroad for said cotton were transmitted to them, and that they on the faith thereof, and in the usual course of their business, made advances to said Mitchell & Co. to the full value of said cotton ; that the said Central Railroad failed to deliver to them according to the tenor of said bills the following list of bales of the weights and value following:

2 bales cotton, A J, January 1, weighing 1030 lbs.

1 bale cotton, E C, January 1, weighing 590

1 bale cotton, J B L, weighing 465

6 bales cotton, J J G, weighing 2505

1 bale cotton, C C, January 5, weighing 390

1 bale cotton, S R in a square, January 24, 425

2 bales cotton, E H in a square, Dec. 18, '69, 820

14   6225 lbs. @ 23¾c.=1478 43.

They therefore ask judgment for the said sum of $1478 43, with interest and with privilege on the property attached.

The defendant answers by a general denial, and specially alleges that ten (10) of the fourteen bales sued for, to wit: six marked "J J G," two marked "A J," and two marked "E H" in a square, were not in fact delivered to or received by defendant as stated in said receipt of January 1, 1870, and that it was an error on the part of the person signing said receipt to include said ten bales therein; that said receipt should have been for twenty-three (23) bales only, and that defendant is liable under said receipt for twenty-three bales only; and that defendant duly delivered or accounted for the twenty-three bales for which it was liable; and as to the remaining four bales sued for, two of them, marked "E C" and "S R" in a square, were actually delivered to plaintiffs, and the other two marked "J B L" and "C C" have been fully settled for with plaintiffs by defendant permitting them to retain two other bales marked "J T," which were delivered to plaintiffs in error, instead of to W. B. Thompson, the consignee, who was paid for the said two bales marked "J T."

There was judgment in favor of plaintiffs for $1273 32 and defendant appeals.

It is admitted that plaintiffs correctly state the weight and value of the cotton. The two bales marked "J T" are shown by plaintiffs' account sales to have netted two hundred and five dollars, which was by plaintiffs carried to the credit of J. W. Mitchell & Co. The defendant was clearly entitled to credit for these two bales, and as they stood in lieu of two belonging to Mitchell & Co., which were lost, Mitchell & Co. were, of course, to be credited with their proceeds. Any other course would have made plaintiffs clear gainers of these two bales. We see no reason why plaintiffs should complain. The evidence clearly shows that Mitchell & Co. did not ship them to plaintiffs, who produce no bill or receipt of the railroad for them. The district judge correctly credited defendants with their proceeds.

I presume, by oversight the district judge failed to credit defendant with the two bales marked "S R" in a square and "E C," which the testimony of Hunt, one of the plaintiffs, admits were delivered or ac-

counted for. Their weight was 1015 pounds, which at 23¾ cents amounts to $241 06, for which defendants should have credit.

There remain, therefore, only ten bales in controversy, to wit: Two marked "A J," six marked " J J G," and two marked " E H " in a square.

The defendant says that by error double receipts were given for these bales, once on the eighteenth of December, 1869, and again on the first of January, 1870, by including them in the receipt for thirty-three bales, and, we think, evidence establishes that allegation. The two receipts, when compared, show it. The one of the eighteenth of December is for these ten bales, and that of the first of January bears ten bales, of the same numbers and marks. Besides, the defendant's agent at Goodman swears positively to the fact, and satisfactorily explains how it happened. He also states that Mitchell some time after admitted the error, saying his books only disclosed one lot of cotton bearing the same brands. If this controversy were between the shipper and the defendant, there would be no room to doubt the right of defendant to relief. But the plaintiffs allege, and prove, to my satisfaction, that in the course of their business and on receipt and faith of these bills of lading, they advanced in good faith to the shipper thereon to the full value of the cotton represented by them. The receipt of the bills was by law equivalent to the receipt of the cotton, so far as related to plaintiffs' rights for advances made. The law in the interests of commerce, and in order to give security to business transactions, has thrown peculiar guards around the rights of persons advancing money on such bills. To allow the carrier to dispute the truth of his bills in the hands of innocent parties who in good faith had advanced upon them, would be to destroy all confidence, upon which commerce so much depends. We understand the better opinion to be that "as between the shipper and carrier a bill of lading is open to explanation and correction; but that as between the carrier and a third person holding it for a valuable consideration it is not." See Dickerson vs. Seelye, 12 Barb. 102: Parsons Mercantile Law, 347.

The case of Buckingham vs. Freeman, 18 How. 188, has been referred to as announcing a different doctrine. But upon an examination, we do not think so. In that case the owner of a vessel agreed to sell it to John Holmes, reserving mortgage and lien for the unpaid price. John Holmes gave up the entire control of the vessel to his son, Sylvanus Holmes, who was doing a commercial business under the name of S. Holmes & Co. The son, S. Holmes, appointed the master, whom he induced to fraudulently sign bills for an invoice of flour, upon which S. Holmes & Co. got advances from the plaintiffs, who, upon non-delivery of the flour, libeled the vessel, claiming a lien on it. The original owner (vendor) intervened, claiming that his rights were superior to libelants'. The court say the questions are, have the libelants a lien on the vessel

under the maritime law, and is the general owner estopped from show-ing the truth, as against a *bona fide* holder of the bills procured from a master' by fraud of an owner *pro hac vice*. The court seems to predi-date its decree rejecting the claims of libelants, on the grounds that they have no lien under the admiralty law, and that the master who signed the bills was not the agent of the claimant, the original owner (vendor); that the real owner, the claimant, was not personally liable for the bills, and by the admiralty law the vessel was bound only when he was.

We are aware that there has been, and perhaps still are, conflicting opinions as to the extent of the liability of carriers toward third per-sons taking or advancing upon their bills of lading; and that the pre-vailing doctrine in England is that they are not liable for goods not actually delivered to their agents. But we have seen that at least some high American authority lays down a different doctrine, which, however, is not every where accepted in this country. It may therefore be fairly said that the question is not a settled one here, and we think it our duty to accept that view which seems most in consonance with our own laws, and best calculated to give security to commerce.

In the case at bar the defendant does not dispute the authority of its agent at Goodman to sign bills of lading. Nor, indeed, could it suc-cessfully do so; for it would indeed be strange if a carrier could hold out to the public that a certain person was its agent to receive goods for transportation, and for months execute the contracts of affreightment made by him, and then, when loss or damage results from the negligence of that agent, dispute his authority. It is a proper occasion to apply the familiar rule, commended alike by law and reason, that " when one of two innocent persons must suffer, he, who, by occasioning the confi-dence, has created the loss, shall bear it. 3 An. 400; 4 An. 19. The ques-tion as to the extent of the powers of the master of a ship under the maritime law I do not feel called upon to discuss, as I think there is a clear distinction between that question and the one in this case, which relates to the authority of a railroad station-agent. Nor am I disposed to perplex myself with the long discussions and subtle distinctions of the writers on this subject. I think the statutes of our own State indi-cate with clearness the line of decision for us.

The act of 1868, No. 150, after forbidding the execution of warehouse receipts or bills of lading for goods or merchandise, unless the same shall have been actually delivered or shipped, and denouncing heavy penalties for violation of the prohibition, extending even to pun-ishment for five years in the Penitentiary, proceeds, in its sixth section, to provide that the holder of such receipts or bills of lading shall be de-creed owner of the merchandise described therein.

Section nine provides that "all receipts, bills of lading, vouchers, or other documents, issued by any * * * boat, vessel, or railroad * * * as by this act provided, shall be negotiable by indorsement in blank, or by special indorsement, in the same manner and to the same extent as bills of exchange and promissory notes now are."

The animus of this statute is unmistakable. It was intended to protect both the carriers and the public—the former by punishing any persons in their employ for issuing false bills of lading or receipts, and the latter by putting such bills or receipts upon the same footing as commercial paper, and protecting the holder in good faith with all the privileges and immunities given to bills of exchange and promissory notes. I feel constrained therefore to hold that the agent of defendant, at Goodman, had authority to sign bills of lading for his principal, and that that bill, in the hands of the plaintiffs, can not be shown to have been given for a larger amount than defendant received. I think the judgment appealed from, less the credit stated herein, should be affirmed.

---

DeBlanc, J. Instead of giving but one bill of lading for twenty-three bales of cotton actually delivered, defendant's acknowledged agent gave two bills of lading, one in December, 1869, the other in January, 1870, for all together thirty-three bales.

In the course of their usual business, on the faith of these bills of lading, plaintiffs advanced the full value of the cotton which said agent thus declared to have been received and shipped.

For every act of the agent, performed by him within the scope of his authority, the principal is bound. In this case, the bill of lading was signed by one expressly employed to sign those bills. For his errors who must suffer? Is it those who, deceived by the error, have disbursed and advanced their money, or is it the principal, who vouched for and guaranteed a proper and correct exercise of the delegated authority, a strict and faithful discharge of every duty imposed by the mandate? The principal's signature to the bill of lading would not have more effectually bound him than did the signature of his chosen, his recognized, agent.

He is bound under the general rule; he is also bound under the act of 1868. Under that act the bill of lading, as a bill of exchange or a promissory note, "may be transferred by indorsement, and any person to whom the same may be transferred shall be deemed and taken to be the owner of the produce or commodity thereon specified, so far as to give validity to any pledge, lien, or transfer made or created by the holder of the same. That no printed or written condition or clause inserted or attached to

any bill of lading, which in any way limits the liability imposed by this act, shall have any effect or force whatsover."

Through its agent, the railroad company certified to plaintiffs that thirty-three bales of cotton had been shipped. On transfer to them of that certificate they advanced the entire value of the cotton, which, according to the agent's declaration, had been delivered to, received, and shipped by defendant. If, under these circumstances, the company is not liable, a carrier's agent, without receiving a single bale of cotton, may attest that he has received one thousand bales, discount the bill of lading, retain the proceeds of the discount, do this under color and by virtue of his agency, and not bind his principal!

In this case there was no intention of deceiving plaintiffs. This we admit, but, so far as third parties are concerned, what difference would there be between the error or fraud of an agent? If not liable for the error, the company would not be liable for the fraud, and the bill of lading would lose its value, become a snare, a suspected and dangerous instrument.

To decide the question presented it is useless, it seems, to refer to the jurisprudence of other States; we have but to open and read the statute of 1868. It was enacted for the express purpose of fixing, in and for Louisiana, the legal value of a bill of lading. With the provisions of that law planters and merchants are now conversant. The bill of lading has the value of a sale, the stipulation of which can not be changed, can not be limited, except in one way, that indicated in the statute; that is by the words "not negotiable" plainly written or stamped on its face. No other reservation, written or printed, shall have any force or effect whatsoever. These are the terms of the statute.

The law of 1868 was enacted in the interest of commerce; it created one of the most important branches of our credit; it secures the most legitimate transaction; it sanctioned, legalized, and perfected a fair but imperfect custom which prevailed before its adoption, and it is by far wiser and more equitable than the vacillating and doubtful jurisprudence of other States. It guards against carelessness and error, against surprise and deceit, against forgery and fraud. If, as to third parties, it could be explained or contradicted, the bill of lading, though negotiable, could but seldom be negotiated.

If, as provided in the law of 1868, the carrier can not take advantage of any written or printed reservation attached in advance to a bill of lading, of a reservation apparent to all, how could it be allowed to take advantage of that which not only is not written, printed, or apparent, but which, if admissible or admitted in evidence, would entirely or partially contradict the absolute terms, the positive figures of a bill of lading? For instance, were the agent to write across the bill the declaration that

the principal is not responsible for the quantity thereon specified, would that declaration justify the delivery of less than the expressed quantity? Most assuredly not.

As to the holder of a bill of lading, the only inquiries should be, does the instrument bear the signature of a real, a recognized, a proper agent? If it does, then did that recognized agent appear to have acted within the scope of the delegated authority? If he did, the instrument, whether delivered through error or fraud, is binding on the carrier. The error or fraud of an agent is not to be visited on the victims of his negligence or infidelity, but on those who created the trust; otherwise the negotiable instrument shall cease to be, as it now is, a letter of credit, a proclamation, to every purchaser or transferee, that all it contains is right.

For these, and the reasons by him alleged, I concur in the opinion delivered by his honor, Mr. Justice Spencer.