## McLEOD *v.* FOURTH NAT. BANK OF ST. LOUIS.[1]

*(Circuit Court, E. D. Missouri. April 5, 1884.)*

FRAUD—AGENCY—FALSE BILLS OF LADING.

A., the owner of a large number of bales of cotton of merchantable weight, pledged the cotton notes therefor to B., a bank, and afterwards, without B.'s knowledge or consent, had them rebaled at a cotton pickery so as to make three new bales out of two of the old ones, thus reducing the average weight to about 343 pounds. A. then attached the tags which had been attached to the original bales to an equal number of the new ones, so as to make it appear that the cotton notes were for those bales, returned the bales to which the tags were attached to the warehouse, and retained the balance. C., B.'s cashier, was thereafter informed that some of the cotton held in pledge had been manipulated, and upon investigation found five bales, to which his attention had been directed, short weight. C. then inquired of A. about the matter, and A. gave him a list of 40 bales which were short weight and only averaged about 390 pounds each, but informed him that there were only a comparatively short number in that condition, and C. testified that he believed the statement. He requested A., however, to put up an additional margin of $4 per bale, which was done D., a foreigner, thereafter agreed to accept A.'s draft for a specified amount, if drawn against a shipment of 600 bales of said cotton, which A. represented to D. would average about 500 pounds each. E., a New York firm, agreed with A. to purchase A.'s draft on D. A. informed B. of the arrangement, and B. gave A. possession of cotton notes for 600 of said bales, in order that A. might make the shipment and get a bill of lading therefor. The real weight of the cotton shipped was 206,043 pounds, but A. fraudulently inserted 276,815 pounds as the weight in the bill of lading. A. then drew a draft on D., and a draft on E. for the agreed price of the draft on D., attached the bill of lading to the draft on D., and turned the whole over to B., which discounted the draft on E., applied the proceeds on its claim against A., and forwarded the draft discounted, together with the draft on D. and the bill of

[1] Reported by Benj. F. Rex, Esq., of the St. Louis bar.

lading thereto attached, for collection.   D. accepted A.'s draft on the faith of the bill of lading thereto attached, supposing the weight therein stated to be correct, and when the cotton was received and the fraud discovered, brought this suit against B. to recover the difference between the value of the cotton shipped and the amount of the draft.   If the weight stated in the bill of lading had been correct, the draft would have been fully secured.   The above facts being proved at the trial, it was *held:*

(1) That the knowledge of B.'s cashier was B.'s knowledge.

(2) That if B. had known of the short weights, and, with intent to secure payment of A.'s indebtedness to it, had caused said bills of lading, together with the bill of exchange connected therewith, to be forwarded, it would have been responsible for D.'s loss.

(3) That there was no evidence tending to show any fraudulent intent on B.'s part.

At Law.

The petition states, in substance, that the firm of Norvell, Canfield & Co. pledged cotton notes for 1,200 merchantable bales of cotton, belonging to them, to the defendant, and afterwards, without the defendant's knowledge, got possession of the cotton and had it rebaled, so as to make three new bales out of two of the old ones, and returned 1,200 of the rebaled bales and retained the balance; that thereafter the defendant discovered the manner in which the cotton had been manipulated, and that it was in consequence not good security for the loan, and immediately demanded that said firm, which was known by it to be insolvent, should at once dispose of said cotton in foreign markets, and a member of said firm, who was abroad, induced the plaintiff to agree to accept said firm's 60-day draft for £6,000 upon a consignment of 600 bales of said cotton of merchantable weight of about 500 pounds per bale; that thereafter defendant, being apprised of said agreement of acceptance, and having said bales in its possession, did ship to plaintiff 600 of the rebaled bales in its possession upon a through bill of lading attached to a 60-day draft for £6,000, drawn upon plaintiffs by Norvell, Canfield & Co.; that upon the face of the bill of lading, by which defendant caused the said bales to be shipped, and which was attached to the said 60-day bill of exchange, was set forth for the purpose of delivering plaintiffs a false and fraudulent statement of the aggregate weight of said 600 bales, which did not exceed 192,381 pounds, and a certificate of insurance upon the 600 bales thus shipped, in which the value of the cotton shipped was falsely set forth at $33,000, which was many thousand dollars in excess of its real value; that defendant did not itself discount the bill of exchange, but caused the drawers to sell it to certain brokers in New York for defendant's benefit, and, upon being informed that said brokers would purchase the bill, caused Norvell, Canfield & Co. to draw this sight draft upon said brokers for the proceeds of said bill, to-wit, $29,000, and caused to be attached to it the bill of exchange drawn on the plaintiffs, together with the bill of lading and certificate of insurance, and all of said papers were forwarded to said brokers, and surrendered these to them upon their paying the draft; that, upon the payment of the

draft, the defendant at once applied the proceeds thereof to its reimbursement of the indebtedness of said firm to it, and paid in full, principal and interest, all amounts loaned on the cotton shipped; that said bill of exchange was thereafter presented, with bill of lading, etc., attached, to plaintiffs, and by them accepted while they were still in ignorance of said division of said bales; that the holders of the bill were innocent holders for value, and that the plaintiffs were compelled to pay the bill and did pay it; that the value of the cotton shipped was only £4,173, and was sold by plaintiffs for that sum, thus leaving a deficiency of $9,000; and that defendant knew of the condition of the cotton shipped, and was the beneficiary of the fraud.

Judgment was asked for $9,000, with interest.

The case was tried before a jury.

Evidence was introduced at the trial tending to prove that the cotton had been manipulated as alleged, and that the tags which had been attached to the original bales were attached by Norvell, Canfield & Co. to the rebaled bales returned to the warehouse by them, so as to make it appear that the cotton notes were for the bales returned; that the weight stated in the bill of lading attached to said firm's draft on the plaintiff was 276,815, which was 70,722 pounds in excess of the real weight of said cotton; that said firm had represented to plaintiff that the bales would weigh about 500 pounds apiece; that merchantable bales usually weigh from 450 to 460 pounds; that the bales shipped averaged 343 pounds; that said firm's draft was accepted on the faith of said bill of lading; that before plaintiff agreed to accept said draft, as alleged in the petition, the defendant's cashier had received information that said firm had had some of the defendant's cotton repicked, and had left a portion of it short weight; that the weights of fourteen bales were furnished to him by a friend, and were found to be light weight, but only five of them belonged to the lot pledged; that said cashier then inquired of a member of said firm about the rebaling of said cotton, and was told that most of it was all right and believed it; that said firm gave him the weights of 40 short-weight bales, averaging about 390 pounds each, and informed him that there was only a comparatively short number in that condition; that after making said inquiries said cashier requested said firm to put up an additional margin of four dollars a bale, and the margin was put up; that when said shipment was made to the plaintiff the defendant gave said firm possession of cotton notes for 600 bales of said cotton, in order that the firm might get a bill of lading therefor; that the false weight was inserted in the bill of lading without the defendant's direction; that a firm in New York had agreed to purchase Norvell, Canfield & Co.'s draft on the plaintiff, and that after procuring said bill of lading the latter firm drew their draft on the plaintiff and attached the bill of lading thereto, and also drew on said New York firm for the agreed price to be paid for the draft on the plaintiff; that both of said drafts and said

bill of lading were then turned over to the defendant, which discounted the draft on New York, applied the proceeds on *its* claim against Norvell, Canfield & Co., and then forwarded said draft, together with said draft on the plaintiff with the bill of lading attached, for collection.

*Overall & Judson,* for plaintiffs.

*Finkelnburg & Rassieur* and *George A. Madill,* for defendant.

TREAT, J., (*charging jury.*) There seems to be no dispute as to many of the facts in this case. The cotton in question went forward to the plaintiffs under the bill of lading and hypothecation, on which the plaintiffs had a right to rely. It also appears that the statements as to weights contained in the bill of lading were false, whereby a loss to the plaintiffs occurred, as stated in the petition. Who is responsible therefor? Unquestionably, Norvell, Canfield & Co. But is the defendant liable? It seems that the defendant had advanced on cotton notes pledged to it a sum of money, and intrusted the cotton notes to the pledgeor for the purpose of forwarding the same. The same were forwarded with the bill of lading and hypothecation, whereby the plaintiffs, as acceptors of the bill, received the same in the faith that said bill of lading was a true statement as to weight, etc. There seems to be no doubt that the plaintiffs, relying on the bill of lading, accepted the draft accompanying the same, and consequently had a right to trust to the correctness as to the weight which they indicated. That there was a fraud perpetrated the jury will probably have no difficulty in determining. But who is responsible therefor? There is no doubt where the ultimate responsibility rests. In this case it is to be determined whether there is an intermediate liability, to-wit, the connection of the defendant with the fraud perpetrated. If the defendant knew of the fraud, to-wit, the short weights, and with the *intent* to secure to itself payment of indebtedness by Norvell, Canfield & Co., caused said bill of lading, together with the bill of exchange connected therewith, the proceeds of which it was to receive, to be forwarded, then the defendant is responsible for the loss incurred; otherwise not.

The proposition seems to be narrowed down to this inquiry: Did the defendant *know* that the weights were false on the shipment; and if so, did it assent thereto with the intent to defraud the plaintiffs as acceptors or drawers of the bill? Whatever the cashier of the defendant bank did the defendant is liable for. Hence, the inquiry may be directed to the ascertainment of his knowledge and intent, and also the knowledge and intent of any other officer of the defendant. Did the defendant through its cashier or any other officer, *know* that there were false weights sent forward in the bill of lading, and *assent* to the forwarding of such false weights with the intent of defrauding the parties plaintiff? Is there any testimony of any such fraudulent knowledge or intent upon the part of the defendant? There is no testimony showing that there was any such fraudulent intent on the

part of the defendant. Therefore your verdict will be for the de-fendant.

The jury found a verdict for the defendant. Thereupon the plaintiffs filed a motion for a new trial, which, having been duly considered, was overruled.

---

LIABILITY FOR FRAUDS PERPETRATED BY MEANS OF FALSE OR FORGED BILLS OF LADING. Several questions are involved in the principal case, and among others, the question of whether or not a principal is liable for a fraud perpetrated for his benefit by his agent, in the course of his service, but with-out his express command or privity, where he has enjoyed its fruits? That question has been answered in the affirmative by high authorities.[1] It will not be discussed, however, in this note, which will be devoted to a presentation of the English and American cases in which frauds have been perpe-trated by means of false or forged bills of lading. In deciding such cases the courts have frequently been called upon to define the nature of bills of lad-ing. The following definition was given by Mr. Justice MILLER, in deliver-ing the opinion of the court in *Pollard* v. *Vinton :* [2] "A bill of lading is an instrument of a twofold character. It is at once a receipt and a contract. In the former character it is an acknowledgment of the receipt of property on board his vessel by the owner of the vessel. In the latter it is a contract to carry safely and deliver."

It has frequently been contended that bills of lading are negotiable, like bills of exchange, but it is now well settled that they are not. "The indorse-ment of a bill of lading, under the most liberal decisions made anywhere, is no more than an assignment of the shipper's obligation, and of the property called for by the bill. It involves no promise on the part of the indorser to do anything towards forwarding the property to its destination. If the in-strument is fictitious, or if there is any fraud practiced in transferring it, any remedy that the transferee would be entitled to would be for that special wrong, and not by importing into the indorsement a promise to perform what the carrier has agreed to do." [3] And it has been held that the rule as to a *bona fide* purchaser of a lost bill of exchange, indorsed in blank payable to bearer, has no application to the case of a lost bill of lading.[4]

Of all the cases in the English and American reports, the one most closely re-sembling the principal case is *March* v. *First Nat. Bank of Mobile.*[5] In that case the defendant had discounted a draft with a bill of lading attached, and had discovered afterwards, but before the draft was presented for acceptance, that the property described in the bill of lading was claimed by the factors who had sold it to the shipper, and that the bill of lading was probably not security of any value in its hands, and had, immediately after making the dis-covery, hurried up the presentation for acceptance, and the drawee had ac-cepted the draft upon the faith of the bill of lading, which he supposed good security. The defendant had then immediately transferred the draft, without recourse, to a *bona fide* holder for value without notice. The action was by the acceptor for the amount of the bill. In delivering the opinion of the court, affirming a judgment for the plaintiff, DAVIS, P. J., said: "Doubtless, if a bill of exchange had been sent alone, and accepted by plaintiffs, they would have

---

[1] Mackay v. Com. Bank of New Bruns-wick, 5 Priv. Council, (Eng.) 394 ; Mitchell v. Donahey, 17, N. W. Rep. 641.
[2] 105 U. S. 7.
[3] Opinion of Campbell, J., in Maybee v.

Tregent, 47 Mich. 495 ; S. C. 11 N W. Rep. 287.
[4] Shaw v. Railroad Co. 101 U. S 557
[5] 4 Hun, (N. Y.) 466.

had no redress against the defendant, however well the failure of the bill of lading as security might have been known to them. The defendants were under no obligations to make any disclosures of facts to the plaintiffs to prevent their acceptance of the bill, but they were under obligation to do nothing and say nothing, with knowledge of the real facts, which would operate to secure an acceptance by an expression of falsehood or a suppression of truth. Knowing that the bill of lading was of no value, the defendants had no right to induce the acceptance of the bill of exchange, by presenting the bill of lading as one of value, concealing their knowledge of its true character." But though it is a fraud for a party, who has notice that a bill of lading attached to a bill of exchange is valueless or of less value than it purports to be, to induce the drawee to accept, by presenting the bill of exchange for acceptance with the bill of lading attached, and without explanation, yet the fact that a bill of exchange has been accepted on the faith of a forged bill of lading is no defense in an action by a *bona fide* holder for value and without notice.[1] And where a bill of exchange, with a forged bill of lading attached, is presented for acceptance by, and afterwards paid to, a party who has no notice of any defect in the bill of lading, the acceptor cannot recover his money back again.[2]

So where a bank is requested by a customer to accept the draft of a third person, if accompanied by a bill of lading, and accepts a draft with a forged bill of lading attached, the customer will have to bear the loss.[3]

SUITS AGAINST COMMON CARRIERS. The majority of the cases of this kind have been against common carriers who have issued bills of lading receipting for merchandise in good condition, when in bad condition, or for property never received at all.

It is well settled that where the master of a vessel issues a false bill of lading, and money is advanced upon the faith of it, or it is transferred for value to a party having no notice of its falsity, the master himself is estopped from contradicting its recitals, as against the party who has made the advances, or to whom it has been assigned.[4] And where the owner of a vessel issues a false bill of lading the doctrine of estoppel is equally applicable.[5] There is some conflict of authority, however, in this country as to whether or not a principal is liable for false statements in a bill of lading issued without his knowledge by an agent. In England it seems that he is not, as a general rule, though it was held in the case of *Howard* v. *Tucker*[6] (1831) that a ship-owner is estopped, as against a *bona fide* holder for value of a bill of lading issued by the master of his vessel, from contradicting the statement therein that freight has been paid by the consignor.

The leading English case is *Grant* v. *Norway*,[7] (1851,) which was an action on the case by the indorsees of a bill of lading, against the owner of a vessel, to recover the amount of advances made by the former upon the bills of lading, the goods never having, in fact, been shipped. The court held that the master of a ship signing a bill of lading for goods which have never been shipped cannot be considered as the agent of the owner in that behalf, inasmuch as a general authority to sign bills of lading only extends to cases where actual shipments are made, and that a party taking a bill of lading, either originally or by indorsement, for goods which have never been put on board, is bound, in order to hold the ship-owner liable, to show some particular authority given to the master to sign it, and that, as no such au-

[1] Robinson v. Reynolds, 2 Adol. & E. (Eng.) 834; Kelly v. Lynch, 22 Cal. 661; Thiedemann v. Goldschmidt, 1 De Gex, F. & J. (Eng.) 4.

[2] Leather v. Simpson, 40 L. J. Eq. 177; S. C. 11 Eq. 398.

[3] Woods v. Thiedemann, 1 Hurl. & C. (Eng.) 478.

[4] Valieri v. Boyland, 12 Jur. 566; Relyra v. N. H. R. M. Co. 42 Conn. 579; Bradstreet v. Heron, 2 Blatchf. 116.

[5] Relyra v. N. H. R. M. Co. 42 Conn. 579; Schooner Freeman v. Buckingham, 18 How. 182.

[6] Barn. & Adol. 712.

[7] 10 C. B. 664.

thority was shown in that case, the plaintiff could not recover. In *Hubersty* v. *Ward*,[1] (1853,) which was an action in trover for wheat by the indorsees of a bill of lading therefor, the court of exchequer placed its decision upon the same ground. The same doctrine was applied, in *Coleman* v. *Riches*,[2] (1855,) to a case where the agent of a wharfinger had fraudulently given a receipt for goods which had not been delivered to him. And in *Brown* v. *P. D. S. C. Co.*,[3] (1875,) it was applied in a case where the master had receipted for more coal than he had received.

In America, *Grant* v. *Norway* has been followed in Lousiana,[4] Maryland,[5] Massachusetts,[6] Missouri,[7] and the federal courts;[8] but the doctrine of that case has been rejected in New York,[9] Kansas,[10] and Nebraska.[11] The Massachusetts and Missouri cases are cases of shortage. *Lehman* v. *Cent. R. & B. Co.* is a case in which the bill of lading in question was written by the shipper in such a way that it was easy to raise it, and was signed by the defendant's agent in that form, and afterwards raised by the shipper and transferred for value. In the other cases cited, which follow *Grant* v. *Norway*, the bills of lading were issued without any goods having been received. In Pennsylvania,[12] and the district court for the Southern district of New York,[13] it has been held that carriers are estopped as against indorsees for value, and parties who have advanced money upon the faith of bills of lading issued by their agents, from contradicting the statement therein, that the goods receipted for were received in good condition. But where, though the bill of lading contains a statement in writing as to the condition[14] or weight[15] or nature[16] of the property receipted for, it nevertheless states, in print or otherwise, that the condition or weight or nature, as the case may be, is unknown, then the statement, if as to condition, must be understood as referring to the external condition; and if the statement is as to weight or nature, it should be taken as a statement of what the shipper has represented it to be.

The cases referred to, in which the doctrine of *Grant* v. *Norway* has been rejected, hold that though a general authority to issue bills of lading gives no power to issue them for goods not received, yet if an agent having power to issue bills of lading for goods delivered to him for transportation issues a bill of lading for goods which have not been delivered, and an innocent third party purchases it, or advances money upon the faith of it, in the regular and ordinary course of business, then the carrier should be held liable for the loss sustained through the negligence or fraud of its agent, and should be estopped from contradicting the receipt of the goods, upon the principle that "where one of two innocent persons must suffer by reason of the fraud or misconduct of a third, he by whose act, omission, or negligence such third party was enabled to consummate the fraud ought to bear the loss." That principle seems to have been recognized in *Howard* v. *Tucker*, *supra*, but to have been entirely overlooked in *Grant* v. *Norway* and the cases following it.

*St. Louis, Mo.* BENJAMIN F. REX.

[1] 18 Eng. Law & Eq. 551.
[2] 29 Eng. Law & Eq. 325.
[3] 10 C. P. 562.
[4] Hunt v. M. C. R. Co. 29 La. Ann. 446.
[5] B. & O. R. Co. v. Wilkins, 44 Md. 11.
[6] Sears v. Wingate, 3 Allen, 103.
[7] Nat. Bank v. Lavielle, 52 Mo. 580.
[8] Schooner Freeman v. Buckingham, 18 How. 182; Vandewater v. Mills, 60 U. S. 90; Pollard v. Vinton, 105 U. S. 7; The Loon, 7 Blatchf. 244; The Joseph Grant, 1 Biss. 193; Lehman v. Cent. R., etc., Co. 12 Fed. Rep. 595; Robinson v. M. & C. R. R. Co. 9 Fed. Rep. 129.

[9] Dickerson v. Seelye, 12 Barb. 99; Armour v. Railroad Co. 65 N. Y. 111.
[10] Wichita Savings Bank v. A., T. & S. F. R. Co. 20 Kan. 519.
[11] S. C. & P. R. Co. v. First Nat. Nank, 10 Neb. 556; S. C. 7 N. W. Rep. 311.
[12] Warden v. Green, 6 Watts, 424.
[13] Bradstreet v. Heron, 1 Abb. Adm. 206.
[14] Clock v. Barnwell, 53 U. S. 272.
[15] Ismaele, 14 Fed. Rep. 491; Jessei v. Bath, 2 Exch. 267.
[16] Miller v. H. & St. Jo. R. Co. 90 N. Y. 430.